IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Orthofix, Inc.,                                     Case No. 3:13 CV 828

                Plaintiff,                   MEMORANDUM OPINION
                                                    AND ORDER

      -vs-
                                                    JUDGE JACK ZOUHARY
Eric W. Hunter,

                Defendant.

**INTRODUCTION**

This is one of several cases between the same competitors that involves the poaching of salespeople in the medical device industry. Eric Hunter was employed by Orthofix as a medical device salesman from 2000 until 2012, when he abruptly quit via a middle-of-the-night email and joined Orthofix's competitor, DJO, that same morning. This stab in the back took place after Orthofix refused Hunter's proposal to become an independent distributor with Bob Lemanski, another Orthofix salesman. The two secretly plotted their escape with the help of DJO, over the course of several months, taking with them sales information, including unexecuted orders for Orthofix products which were later filled by DJO. From there, things got messy.

This Court held a bench trial July 15–17, 2014 and heard final arguments on August 21, 2014, preceded by a Preliminary Order (Doc. 99) and briefing (Docs. 103–04).

**FINDINGS OF FACT**

**Hunter's Employment with Orthofix**

Hunter is a 46-year-old medical device salesman who is presently self-employed (1Tr. 54[1]). In early 2012, he joined with Lemanski to form Hunter, Lemanski and Associates (1Tr. 54–55). The firm is an independent distributor of DJO medical devices (1Tr. 55), including DJO bone growth stimulators (1Tr. 67).

Orthofix employed Hunter as a salesman from 2000 until November 2012. As an Orthofix salesman, Hunter primarily sold bone growth stimulators, devices typically worn outside the skin of patients who have fractured a bone or undergone spinal fusion surgery. The lightweight, battery operated devices emit weak electrical currents or ultrasonic waves to facilitate bone healing (*see* 2Tr. 71). Three main competitors control the bone growth stimulator field -- Orthofix, DJO (also known as DonJoy Orthopedics), and EBI (also known as Biomet). At the time he left Orthofix in 2012, Hunter's direct supervisor was Chris Summers, a regional sales director based in Cincinnati (2Tr. 107).

Prior to joining Orthofix in 2000, Hunter had no experience selling medical devices to physicians and no experience with or knowledge of bone growth stimulators (1Tr. 55). Hunter graduated from the University of Toledo with a bachelor's degree in exercise science (2Tr. 70). He then sold disability diagnostic computer programs to healthcare facilities (1Tr. 56).

---

[1] 1Tr. refers to Volume 1 of the trial transcript, filed as Doc. 100; 2Tr. to Volume 2 (Doc. 101); 3Tr. to Volume 3 (Doc. 102). Ex. refers to trial exhibits.

When Hunter joined Orthofix, he signed, after consulting with an attorney, an employment agreement containing, among other provisions, non-compete and non-disclosure clauses (1Tr. 58–59). The agreement specified that it would be governed by Texas law (Ex. 1, Art. 9).

Hunter began as a territory sales manager and later became a district sales manager (1Tr. 71). He worked to make contacts with orthopedic doctors, podiatrists, and neurosurgeons in the Toledo area (2Tr. 71–72). He developed customers and learned about the practices of the doctors in his territory, inquiring about their schedules, prescribing habits, and preferred brand of bone growth stimulators. Initially, Hunter's sales territory covered northwest Ohio and a portion of southeast Michigan (1Tr. 70). His territory later expanded to include northern Indiana and part of metro Detroit (1Tr. 71).

As a district sales manager, Hunter was responsible for overseeing and mentoring junior sales representatives. One of those junior sales representatives included Lemanski, a Detroit-based representative whose territory encompassed northern metro Detroit (1Tr. 72, 148). In 2009, as a result of a compliance violation by Hunter for selling competitor products with his wife, Orthofix demoted Hunter and took away his metro Detroit territory. Lemanski took over most of the doctors in Detroit that Hunter had been servicing.

In April 2012, Hunter and Lemanski approached Summers about becoming independent distributors for Orthofix, rather than W-2 employees (2Tr. 63). As independent distributors, they would be able to sell non-Orthofix products and a wider array of products (2Tr. 249). They presented Summers with a document entitled "Business Plan for Metro Detroit and Northwest Ohio" (Ex. 28). Orthofix rejected their request (2Tr. 92; 2Tr. 250).

**Hunter Quits Orthofix and Joins DJO**

In June 2012, after Orthofix rejected their independent distribution proposal, Hunter and Lemanski began plotting an exit from Orthofix and joining DJO (1Tr. 147–48; 2 Tr. 100–01; Ex. 35; Ex. 70). Richard Spina, DJO's then-area vice president of sales for the central United States, which included Detroit, contacted Hunter (1Tr. 147–48). Hunter presented Lemanski as his partner to Spina and the three discussed Hunter and Lemanski joining DJO (1Tr. 148). During that summer, Hunter and Lemanski traded text messages about jumping ship for DJO and how to do so without violating their non-compete clauses with Orthofix, including the following exchange (Ex. 70A, 7/1/12 msgs):

HUNTER: Bob i just left 6pm Mass. While in church i had an idea. Its far out, maybe God put the idea in my head, ha, he's prob too busy to be giving me business ideas, but what if we started to sell pain cream soon and then we hopefully get fired then we dont have to worry about a non-compete, just a thought. We'd have to have our ducks in a row. I never wanted to get fired but maybe in 90 days I want both of [u]s to get canned? Fritz could help us if we wanted to know

LEMANSKI: That's what I was thinking

Interest it's not a far out idea

HUNTER: Dj might like it cause of the potential legal fees savings.

I like my ringtone idea Im still laughin

LEMANSKI: Would we really get caught w/ the pain cream?

HUNTER: Not likely but we caould ultimatum Chris [Summers] that we are ready t[o] do our distributorship like it or not and we could piss him off so he would go to Faucett then we act realy cocky and disrespectful so they ultimatum us and say stop or your fired. I k now how to really piss those jackasses off by being cocky and disrespectful. Ha!

In August 2012, Hunter faxed his Orthofix employment agreement to Spina (Ex. 37). Hunter and Lemanski also presented Spina with a business plan for the Detroit region dated August 8, 2012,

4

proposing a distribution relationship with DJO for bone growth stimulators (Ex. 38). The "Executive Summary" of the business plan outlined Hunter and Lemanski's proposed venture in hyperbolic yet vague terms:

> The population of Metro Detroit is 6 million while Northwest Ohio is estimated at 1 million. Eric Hunter and Bob Lemanski have a combined 18 years of Orthofix sales experience. We have worked well together and have forged a friendship over the last 6 years. Together as a team we have created synergies, produced new ideas, and executed on those new ideas to produce significant revenue growth. We can produce even more revenue growth over the next two years in the aforementioned markets.
>
> * * *
>
> We believe we can accomplish our goals by becoming a distributor. In addition to having secretaries to complete our paperwork, we would hire several sales associates to focus solely on the promotion and execution of our spine stimulation business. * * * We would have more feet on the street. We would be able [to] strengthen our relationships by giving customers more time and attention[,] [w]hile also having more time to find new opportunities. These opportunities could come from expanding the prescribing habits of our existing customers, finding new customers, wholesale requests to networking with other local distributors. * * * In this case 1 + 1 CAN = 4 PLUS.

Hunter and Lemanski met with Spina at an Italian restaurant in Southfield, Michigan, at which time they showed Spina their W-2 wage statements from Orthofix and copies of their respective Orthofix sales reports and discussed further their "business plan" for metro Detroit (1Tr. 159–60). Spina asked Hunter and Lemanski for an account-by-account breakdown of their Orthofix stimulator sales, which Hunter and Lemanski provided (1Tr. 161–62).

The three concocted a plan for Lemanski and Hunter to join DJO yet avoid legal issues presented by their Orthofix employment agreements. Upon joining DJO, Lemanski would not sell bone growth stimulators for one year. Instead, he would approach the same doctors to whom he had previously sold Orthofix stimulators, and, as a DJO salesman, sell them pain cream and other pain relief devices (1Tr. 171). Hunter, on behalf of DJO, would sell those same doctors who were former

5

Lemanski clients, DJO bone growth stimulators after an introduction by Lemanski (1Tr. 171). Hunter would cease selling bone growth stimulators to his Orthofix customers and would instead introduce those customers to Spina or Ed Fazio, another DJO representative (1Tr. 172).

Hunter resigned from Orthofix, effective immediately, by an email to Summers sent on November 13, 2012 at 12:16 AM (Ex. 41). On the morning of November 13, he met with DJO representatives at a hotel in Southfield, Michigan, and signed an employment agreement with DJO that guaranteed him at least $230,000 in salary and commissions for his first year (2Tr. 27; Ex. 43). Hunter resigned with no notice in order to thwart any Orthofix efforts to send in a new sales representative to service the existing northwest Ohio and southeast Michigan Orthofix accounts before Hunter could contact them on behalf of DJO (*see* 2Tr. 101). Text messages between Hunter and Lemanski demonstrate their intent to keep Orthofix representatives out of the Detroit and Toledo areas leading up to their planned departure (Ex. 70A, Msgs. 9/20–25/12):

> LEMANSKI: Chris [Summers] thinks it would be a good idea for us to have an ATM [Area Territory Manager]. He also said u r going on a 60 day plan.
>
> HUNTER: Sure hope we don't have an ATM from another territory arrive in Detroit that would really be a bullet.

Hunter claims he left Orthofix because of Orthofix's recent regulatory issues and Department of Justice investigations. However, Hunter did not cite these issues as his reasons for departing in his November 13 email, nor did he complain about these issues in any meaningful way to his supervisors prior to his termination. Hunter left because Orthofix would not engage him as an independent distributor and because he could make more money with DJO.

Orthofix had no protocol in place for departing employees to return or destroy Orthofix information. When Hunter quit, he had many documents and spreadsheets on his personal laptop that

6

contained Orthofix information, including sales reports and information about physicians in his territory (1Tr. 86–87). Hunter did not delete those files (1Tr. 88; 2Tr. 23). Hunter believed his laptop did not contain any Orthofix confidential information (2Tr. 23).

Hunter also had in his possession a number of hard copy medical files of patients who had been fitted with Orthofix devices. About a week after Hunter left Orthofix, he was advised by an Orthofix human resources employee to destroy the patient files, and Hunter agreed that he would burn the files in his mother-in-law's backyard (1Tr. 87). The human resources employee did not tell Hunter to personally delete files from his computer or to bring his laptop to Orthofix for deletion (2Tr. 80).

### Hunter Calls on Orthofix Customers as a DJO Employee

After resigning from Orthofix, Hunter began visiting physicians who were Orthofix customers. He brought along a DJO representative with him for introduction. Hunter explained to the physicians or their staff that he had left Orthofix and joined DJO. He told physicians he left Orthofix because of fraud investigations and fines levied upon Orthofix in recent years by the Department of Justice (*see* Ex. 46; 2Tr. 31). Hunter also began calling on Lemanski's Orthofix customers to sell DJO bone growth stimulators, maintaining constant communication with Lemanski about those physicians (2Tr. 33; Ex. 70A, Msgs. 11/13/12–12/26/12). Orthofix's sales of bone growth stimulators for Hunter and Lemanski's territory decreased by $2,224,490 from 2012 to 2013 (2Tr. 264; Ex. 87). Orthofix's expert pegged Orthofix's damages to be $1,623,877 in lost profits for accounts serviced by Hunter and Lemanski (Ex. 87).

**"The Playbook"**

Orthofix's counsel, throughout the trial, had difficulty identifying what information was claimed to be protected as trade secrets or deemed "confidential information" under the employment agreement (*see* 1Tr. 236). Eventually, after pressing by this Court, Orthofix pointed to the aggregate of information collected by an Orthofix sales representative about the physicians in his or her territory which may be colloquially referred to as the "playbook." Orthofix does not utilize a standard form for collecting this information (2Tr. 192). Rather, each regional sales manager gives the sales representatives under his or her supervision different instructions on how to collect and maintain physician information. Orthofix only required sales representatives in Hunter's region to maintain customer lists that "show who's using, who's not using, who doesn't believe in stimulation, the amounts of fusions that they do, the types of fusions that they do, the types of grafts they use, the types of implants they use" (2Tr. 192). Orthofix claims various components of the playbook described below constitute trade secrets and confidential information.

*Staff contacts, physician schedules, and preferences.* Hunter acquired physician-specific information over time, by talking to the physicians' staff and meeting with the physicians, often over lunch. Hunter and Lemanski maintained some of this information in spreadsheets, as exemplified by Exhibits 5, 12, and 13. Exhibit 5 contains much of the information collected by Hunter in the form of an Excel spreadsheet that was passed down to him from another Orthofix employee (1Tr. 82; Ex. 5). Hunter would later update the information that included key contacts in the physician's office, physician preferences and physician surgery and office schedules. Surgery and office schedules are valuable because the sales representatives know which days the surgeon is in the office and expecting visitors versus those days he or she is in surgery. The spreadsheet also included a column for Hunter

8

to indicate whether, in his estimation, a physician was "underutilizing" bone growth stimulators in his or her practice (1Tr. 83).

*"Believers" versus "Non-Believers" and "Prescribing Habits."* Hunter also documented on the spreadsheet those physicians who "believed" in the value of bone growth stimulators (and were therefore likely to purchase or prescribe them) and those physicians who were "non-believers" in the benefits of bone growth stimulators. While working for Orthofix, Hunter invested "a lot of time" acquiring information about physicians' bone growth stimulator prescribing criteria (1Tr. 81–82). Physicians will use a stimulator on different types of patients -- some will use it on every multi-level fusion patient, and other doctors will use it only on patients deemed high risk, such as smokers or diabetics (1Tr. 150–51). Hunter documented these prescribing and purchasing habits of physicians on his spreadsheet.

*Customer Lists.* Hunter and Lemanski compiled customer and target customer lists to take with them to DJO (1Tr. 233–34). Hunter also maintained a list of physicians and other business contacts to whom he would send holiday cards (1Tr. 93; Ex. 10). The physicians on the list were customers or would-be customers of Hunter.

*Sales Portal and other Sales Data.* While at Orthofix, Hunter had access to his individual "sales portal." The portal contained sales data for his territory, including order history of individual physicians and sales volume. The portal also enabled sales representatives to track the progress of submitted orders, including progress on obtaining authorization for insurance payments (2Tr. 151). Each Orthofix salesperson had his or her own portal, which was password protected. The portal was accessible only to the individual salesperson and the district sales manager to whom the salesperson reported (1Tr. 92).

9

*Wholesale Prices.* Hunter also had access to "wholesale" price information. In a wholesale scenario, a physician or medical group bought stimulators from Orthofix at a discounted price, and then turned around and sold the stimulators to the patient, and billed the patient's insurance company (1Tr. 96). The physician pocketed the difference between the insurance reimbursement and the wholesale price paid to Orthofix (1Tr. 97). Orthofix tried to keep the wholesale price confidential because if an Orthofix competitor learned of the price, it would approach the physician and either meet or undercut the Orthofix price (1Tr. 99). However, Orthofix's wholesale agreements did not contain a non-disclosure provision; nothing precluded physicians from revealing the prices to Orthofix's competitors or others. Hunter kept wholesale agreements indicating Orthofix wholesale prices on his personal laptop when he left Orthofix (1Tr. 102).

In May 2012, Hunter negotiated for new wholesale prices for Orthofix bone growth stimulators for Mercy Health Systems in Toledo. Dr. Leo Clark is a neurosurgeon affiliated with Mercy who frequently utilizes bone growth stimulators. Soon after joining DJO in November 2012, Hunter solicited Dr. Clark and urged him to start buying DJO bone growth stimulators, undercutting the Orthofix wholesale prices negotiated seven months prior (1Tr. 106–07; Exs. 47–48).

**Orthofix Efforts to Keep the "Playbook" Secret**

One former regional sales manager, Jason Shallenberger, required the sales representatives he supervised to acquire and maintain physician information in a playbook and to submit those playbooks to him on a quarterly or biannual basis (2Tr. 177). Shallenberger instituted this requirement in the event a sales representative departed on bad terms or left for a competitor (2Tr. 233–34). However, Summers, Hunter's supervisor, did not require that of his sales representatives (2Tr. 246) ("Really the only thing that I requested from the reps that worked for me was -- we called

it a territory targets list, and it was just the customers in their territory that were users of our products and customers that were not."). Summers did not take steps to protect the playbooks, explaining that "we pay reps very well. You have to trust your reps" (2Tr. 248).

It was in the best interest of each sales representative to keep his or her playbook close to the chest because if the information contained in the playbook fell into the hands of a competitor, the representative could lose sales. Orthofix also has employees sign, as part of their employment agreement, a provision precluding the disclosure of confidential information. During his employment at Orthofix, no one at Orthofix explained to Hunter what information was deemed "confidential" under the employment agreement (2Tr. 48). No one explained to him directly that Orthofix believed customer names, addresses, and prescribing habits were confidential (2Tr. 48).

## CONCLUSIONS OF LAW

Orthofix tried the following claims to this Court: (1) misappropriation of trade secrets under R.C. §§ 1333.61–69, the Ohio Uniform Trade Secret Act ("OUTSA"); (2) breach of contract (for the non-disclosure provision of Hunter's employment agreement); and (3) tortious interference. Hunter tried his Counterclaim for disputed unpaid commissions.

## ORTHOFIX'S CLAIMS

### Misappropriation of Trade Secrets

Orthofix claims the playbook information constitutes a trade secret under Ohio law, and Hunter wrongfully misappropriated this information when he left Orthofix. Hunter responds that the playbook information is not protected with trade secret status.

Under OUTSA, in order to prevail on a trade secret misappropriation claim, a plaintiff must establish: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a

11

confidential relationship; and (3) the unauthorized use of a trade secret. *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 985 (N.D. Ohio 2008). The burden is on Orthofix to prove, by a preponderance of the evidence, that the playbook information has trade secret status. *Id.*

OUTSA defines "trade secret" as:

[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, *compilation*, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that *satisfies both of the following*:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the *subject of efforts that are reasonable under the circumstances to maintain its secrecy*.

R.C. § 1331.61(D) (emphases added). The Ohio Supreme Court uses a six-factor test to determine the existence of a trade secret. The factors are:

(1) [t]he extent to which the information is known outside the business; (2) the extent to which [the information] is known to [employees] inside the business * * *; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524–25 (1997) (quoting *Pyromatics, Inc. v. Petruziello*, 7 Ohio App. 3d 131, 134–35 (1983)).

The playbook information Hunter allegedly misappropriated *can* constitute a trade secret. Compilations of information not singularly protectable can collectively constitute a trade secret. *See Thermodyn,* 593 F. Supp. 2d at 986–87; *see also* R.C. § 1331.61(D) (defining trade secret to include "compilation[s]"). The information compiled in a playbook is, as a whole, valuable, not readily

available, and acquired at great expense and effort by Orthofix and its sales force (including Hunter). Hunter makes much of the fact that the information contained in the playbook, including the names, addresses, and relevant office contacts for physicians in his sales territory, can be discovered by a scan through the local phone book or a Google search. However, that items may be indivdiually available through public resources is not dispositive. "Where documents already in the public domain are combined to form a larger document, a trade secret may exist if the unified result would afford a party a competitive advantage." *Plain Dealer*, 80 Ohio St. 3d at 528.

This Court also notes that while personal relationships have value in this line of work, Hunter overstates that such relationships trump any information gathered by a salesperson. The two are intertwined, and one cannot be separated to the exclusion of the other. In order to gather information on each doctor's practice and preferences, the salesperson must have a relationship with the physician and his or her staff. However, that relationship does not mean the information gathered is incapable of protection under OUTSA.

As suggested in this Court's prior Order (Doc. 99), Orthofix's misappropriation claim falls short on the efforts it took (or more appropriately, did not take) to protect the information constituting the playbook. The Sixth Circuit has emphasized that a possessor of a potential trade secret must take some active steps to maintain secrecy, because "once material has been publicly disclosed, it loses any status it ever had as a trade secret." *Heartland Home Finance, Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 862 (6th Cir. 2008.). And, "disclosure to potential or actual customers, absent a confidentiality agreement or understanding, will destroy any protection of that information as a trade secret." *Thermodyn*, 593 F. Supp. 2d at 986.

Hunter's immediate supervisor, Summers, did not do much to guard the secrecy of the playbook developed for Hunter's territory (but is doing more now), and Orthofix did not have in place a central directive protecting this information (2Tr. 246–48). Orthofix took no meaningful steps to collect Hunter's playbook information, including key contacts and prescribing habits, or otherwise protect itself from exactly what happened here -- a salesperson defecting for the competitor and with no one able to step up in his place and service accounts. And, when Hunter left the company, Orthofix did not engage in meaningful efforts to seek the return of any trade secret information Hunter might possess. Further, the wholesale prices were disclosed to Orthofix's customers without a confidentiality provision in place. This Court also notes that under the second *Plain Dealer* factor, much of the playbook information was information generally known within the orthopedic medical device business.

Orthofix directs this Court to the non-disclosure clause in Hunter's employment agreement which requires employees and independent distributors to sign such non-disclosure provisions (*see* Ex. 1, Art. 2; Ex. 140, § 8.01). Orthofix also points out that sales history and order information contained in its sales portal were subject to unique username and passwords. And, its Code of Conduct and Employee Manual require employees to keep certain information confidential (Ex. 4A, p. 7 ("Information obtained, developed, or produced by Orthofix and its employees and information supplied by others for the benefit of Orthofix are confidential. * * * This information should not be shared with anyone outside Orthofix"); Ex. 73A, § 4.1 ("Information regarding Orthofix's research activities, new products, designs, marketing programs, plans, financial information and customer lists are all examples of material that is confidential and considered proprietary to Orthofix. * * * Proprietary information should never be discussed outside of the work environment, and each person

14

who has copies of proprietary information shall be responsible for maintaining the information confidentially.")).

While the sales portal is protected by a username and password, the sales portal was merely a conduit by which the sales representatives submitted orders. True, it also enabled a historical look back at a physician's prior orders, certainly a useful feature to salespersons, but this sort of raw data is not the bulk of the playbook information Orthofix claims Hunter misappropriated. And, in any event, Hunter did not access the portal after he left Orthofix (presumably because Orthofix terminated his password access) (2Tr. 97; 2Tr. 149).

The broad pro-forma employee confidentiality agreements in this case are insufficient to preserve trade secret status. *See Equifax Servs., Inc. v. Examination Mgmt. Servs., Inc.* S.E.2d 488, 493 (Ga. App. 1994). That is not to say that employee confidentiality agreements alone are never adequate to establish a trade secret. But, in this case, where there were no reasonable efforts to enforce the clause or monitor the allegedly protected information gathered by employees, the provisions in the employee agreement, handbook, and Code of Conduct are insufficient.

Finally, this Court notes that the thrust of Orthofix's complaints against Hunter -- that he took the skills and information he acquired while he was being paid (and handsomely at that) and jumped ship in the middle of the night for a competitor after months of plotting -- is, at its heart, a non-compete complaint. *See Columbus Bookkeeping & Bus. Servs., Inc. v. Ohio State. Bookkeeping, LLC*, 2011-Ohio-6877, at ¶ 28 ("In the end, much of the information defendants' possessed arose as a result of their day-to-day exposure to and interaction with plaintiff's clients as part of their employment duties, the type of information a noncompetition agreement is designed to address."). This Court has already addressed the non-compete issue by a stipulated Order. As Hunter's counsel acknowledged

15

during final argument, while Hunter left Orthofix in "a boorish fashion" (Draft Hr'g Tr. 25), such a departure does not transform the information into trade secrets.

### Breach of Contract

Orthofix also brings a claim for breach of contract of Hunter's non-disclosure provision in his employment agreement. Hunter argues the non-disclosure provision is unenforceable under Texas law. That provision (Ex. 1, Art. 2) provides:

> Except as required in his/her duties to [Orthofix], Employee agrees that he/she will never use or disclose any confidential information which Employee has acquired during the term of his/her employment with [Orthofix]. Such non-use and nondisclosure means, without limiting the generality of the foregoing, that Employee shall never publish, disclose, use, or authorize anyone else to publish, disclose or use such information.
>
> The term "confidential information" shall include customer lists or identification, trade secrets, processes, product formulations, developments and designs, business and trade practices, sales or distribution methods and techniques, regulatory agreements and business strategies, and other confidential information pertaining to [Orthofix's] business or financial affairs, which may or may not be patentable, which are developed by [Orthofix] at considerable time and expense, and which could be unfairly utilized in competition with [Orthofix].

This Court finds the "confidential information" protected by the non-disclosure provision is coterminous with information protected by achieving trade secret status under Ohio law. During oral argument, counsel for Orthofix could not articulate information that would constitute confidential information but not be classified as a trade secret (Draft Hr'g Tr. 14). Because Orthofix cannot maintain a misappropriation claim, it cannot maintain a breach of contract claim.

Further, without this limited reading, this Could finds this provision would be an unenforceable non-compete clause. *See Oxford Global Resources, Inc. v. Weekley-Cessnun*, 2005 WL 350580, at *2 (N.D. Tex. 2005) (noting that under Texas law, "[i]f a nondisclosure covenant has the practical effect of prohibiting the former employee from using, in competition with the former

employer, the general knowledge, skill, and experience acquired in former employment, then it is more properly characterized as a noncompetition [clause].") (internal alterations and quotation marks omitted). The non-disclosure provision here becomes a lifetime non-compete clause without limitation to time or geography, and would be unenforceable under Texas law. This Court already reformed Hunter's non-compete clause by stipulation of the parties (Doc. 47), with a one-year and 100-mile limitation, and a reformation of the non-disclosure clause, which is also effectively a non-compete clause, would be identical.

### Tortious Interference

Orthofix proceeds under two theories of tortious interference: (1) Hunter tortiously interfered with Orthofix's contracts with physicians when he approached physicians after he joined DJO and made disparaging comments about Orthofix; and (2) Hunter failed to turn in orders placed by customers for Orthofix bone growth stimulators and instead converted or attempted to convert those orders into DJO orders. This Court finds only the second theory has merit.

In the waning days of Hunter's employment with Orthofix, he and Lemanski began hoarding orders customers had placed with them for Orthofix stimulators so that they could bring those orders with them to DJO upon their November 13 departure. Leading up to that date, the two noted orders for Orthofix bone growth stimulators that would not need to be filled until after November 13 (Ex. 40; 1Tr. 227). The number totaled 46, with three of the 46 orders attributable to Hunter's customers, the others to Lemanski's customers (1Tr. 229; 2Tr. 66; Ex. 70A 11/12/12 Msgs). The two never submitted these orders to Orthofix and instead returned the Orthofix orders to the doctors, and told them they could not fulfill the orders because they no longer worked for the company. Hunter and Lemanski then told the doctors they could swap out the ordered Orthofix bone growth stimulators for

17

DJO stimulators (1Tr. 230).  Most of those outstanding stimulator orders were filled by DJO (1Tr. 233).

To prove its claim for tortious interference, Orthofix has the burden of proving by a preponderance of the evidence the following: (1) a business relationship or contract existed; (2) Hunter had knowledge of the relationship or contract; (3) Hunter intentionally and improperly acted to prevent a contract formation or terminate a business relationship; (4) Hunter lacked justification to act in this manner; and (5) damages resulted from Hunter's conduct.  *See Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 924 (N.D. Ohio 2011).

This Court finds that Hunter did tortiously interfere with Orthofix's would-be contracts with those 46 doctors when he and Lemanski orchestrated their flight from Orthofix.  Hunter had no justification for doing so, and Orthofix suffered damages in the form of lost profits from those 46 orders.  Hunter was the ringleader and instructed Lemanski to bring his outstanding Orthofix orders with him to a meeting with DJO representatives (Ex. 70A, 11/9–12/12 Msgs.)

This Court also finds Orthofix has met its burden of proof with respect to damages on this claim.  Given the information imbalance (the orders remained at all times in Hunter's possession), the methodology presented by Orthofix is a reasonable estimate supported by record evidence (*see* Doc. 105 at 12–13).  Using a 36.5% profit margin (2Tr. 269–70) at the conservative St. Vincent wholesale agreement rate of $3,695 per unit (1Tr. 98), this Court awards damages for Orthofix in the amount of $62,039.

### HUNTER'S COUNTERCLAIM

Also remaining is Hunter's Counterclaim for certain unpaid commissions and expenses. Orthofix stipulates that it owes Hunter $8,710 while Hunter claims he is owed $20,262. This Court finds Hunter failed to prove by a preponderance of the evidence that his figure is the proper amount.

The only evidence offered by Hunter is his November 13, 2012 resignation email in which he states he is owed this amount of money (Ex. 41). This Court finds that email to be of little to no evidentiary value on the issue of the correct computation of unpaid commission and expenses. Orthofix offered evidence about how it arrived at the $8,710 figure through testimony about how commissions are awarded for "tagging" of Trinity Evolution and metal implant laminoplasty sales (2Tr. 164–65; 2 Tr. 199–201; Ex. 83). Because this amount was tendered and rejected, no interest is owed. Therefore, this Court awards Hunter $8,710 on his Counterclaim.

### CONCLUSION

For the foregoing reasons, this Court finds in favor of Defendant Hunter on Orthofix's claims of misappropriation and breach of contract and in favor of Plaintiff Orthofix on its tortious interference claim. Orthofix is awarded $62,039 in damages for Hunter's tortious interference. This Court finds in favor of Defendant Hunter on his Counterclaim for unpaid commissions and awards him $8,710.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 24, 2014